**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**CHERI YVONNE CANTERE,**

     **Plaintiff,**

**v.**                               **Case No.: 3:15-cv-12519**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment in their favor. (ECF Nos. 10, 13).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the presiding District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF

No. 10); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); and **DISMISS** this action from the docket of the Court.

## I.    <u>Procedural History</u>

On April 23, 2012, Plaintiff Cheri Yvonne Cantere ("Claimant") applied for SSI and DIB, alleging a disability onset date of March 14, 2012. (Tr. at 247-252, 262, 265); (ECF Nos.  10 at 1, 13 at 2). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 142-47, 153-57, 166-76). Claimant filed a request for an administrative hearing, which was held on June 20, 2014 before the Honorable Michele M. Kelley, Administrative Law Judge ("ALJ"). (Tr. at 34-71). By written decision dated July 14, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 14-33). The ALJ's decision became the final decision of the Commissioner on June 18, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint, and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant then filed a Brief in Support of Motion for Judgment on the Pleadings. (ECF No. 10). In response, the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 13). The time period for Claimant to file a reply to the Commissioner's brief has expired. Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 54 years old on the date of the ALJ's decision. (Tr. at 24). She has a college degree and communicates in English. (Tr. at 297, 299). Claimant has previously worked as a nurse, telemarketer, clinical coordinator, and dental assistant. (Tr. at 299).

### III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments

do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal

limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 31, 2017. (Tr. at 16, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since March 14, 2012, the alleged disability onset date. (Tr. at 16-17, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairment: "cerebrovascular accident." (Tr. at 17-18, Finding No. 3). The ALJ considered Claimant's other alleged impairments of obesity, hypertension, hyperlipidemia, coronary artery disease with tachycardia, deep vein thrombosis, osteopenia, degenerative changes of the cervical spine, GERD, anxiety, and depression, but found them to be non-severe. (*Id.*).

5

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 18, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk a total of six hours in an eight-hour workday; and can sit for a total of six hours in an eight-hour workday. She can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. She can frequently handle and finger with the right upper extremity. She should avoid concentrated exposure to extreme cold and heat, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and work hazards such as unprotected heights and inherently dangerous machinery.

(Tr. at 18-19, Finding No. 5). At the fourth step, the ALJ determined that Claimant was capable of performing her past relevant work as a telemarketer. (Tr. at 23-26, Finding No. 6). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits. (Tr. at 26, Finding No. 7).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant raises three challenges to the Commissioner's decision. (ECF No. 10 at 5-12). In her first challenge, Claimant argues that the ALJ improperly accorded controlling weight to the opinions of non-examining state agency experts when their findings were contradicted by all of the other evidence in the record. (*Id.* at 5-9). Second, Claimant contends that the ALJ's credibility analysis is not supported by substantial evidence. (*Id.* at 9-11). In her third and final challenge to the Commissioner's decision, Claimant argues that the ALJ failed to consider under SSR 06-03p the findings by other agencies; including, that she was entitled to a disabled persons parking placard and qualified for Medicaid benefits. (*Id.* at 11-12).

In response, the Commissioner argues that Claimant has not proven that she is disabled under the Act, that substantial evidence supports the ALJ's evaluation of the medical opinions and Claimant's subjective statements, and that remand is not warranted for further discussion of Claimant's participation in Medicaid and possession of a disabled persons parking placard. (ECF No. 13).

## V.    Relevant Medical Evidence

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The information which is relevant to the issues before the Court is summarized as follows:

### A. Treatment Records

On March 18, 2012, Claimant was admitted to St. Mary's Medical Center ("SMMC") complaining of moderate right-sided weakness, which caused some difficulty walking and mild difficulty with speech. (Tr. at 464, 484). Claimant was noted to have a cranial nerve deficit, slight sensory deficit in her right arm, and severe weakness on her right side. (Tr. at 946). Claimant had decreased grip strength in her right hand; was unable to pick her right arm or leg up off of the bed, although she could slide her leg along the bed; her pedal pulses were decreased in her right leg; and she had decreased sensation in her right extremities. (Tr. at 486). Claimant was seen by Dr. Ijaz Ahmad, a neurologist, who ordered a CT scan of Claimant's head. (Tr. at 454). The scan revealed a watershed infarct in the left frontal and parietal lobes. (Tr. at 489). There were also mild chronic ischemic changes and old lacunar infarcts seen. Claimant was diagnosed with, *inter alia*, right-sided weakness secondary to left frontoparietal infarct. (Tr. at 648). She improved "significantly" during her admission and was discharged on March 31, 2012 in stable condition with a recommendation for outpatient physical therapy. (Tr. at 649).

On August 23, 2012, Claimant was admitted to SMMC after falling at work and hitting her head. (Tr. at 578). Claimant had some mild weakness on her left side, but she had no sensory deficits, cranial nerve deficit, facial weakness, or pronator drift. (Tr. at 583). An EKG showed no acute ischemia, and serial CT scans of Claimant's head showed no changes from the March 2012 scan. (Tr. at 583-84, 638-39). Because Claimant was taking a blood-thinner, Coumadin, she was observed in the hospital until August 24, 2012. (Tr. at 620). At that time, she was determined to be neurologically intact with two normal CT scans of her head. Accordingly, she was discharged to home, with instructions to increase activity as tolerated. Claimant's discharge summary noted that "[i]n fact, the patient was out smoking so [they] had to delay her discharge until she came back." (Tr. at 620).

On August 3, 2012, Claimant initiated mental health care at Valley Health Systems. (Tr. at 970). Her chief complaints were anxiety, stress, and panic attacks. Dr. Sanjay Masilamani performed a review of systems. (Tr. at 972). The only physical complaint he elicited was bladder incontinence, which Claimant related to her stroke. In September 2012, Claimant followed-up with Dr. Masilamani. (Tr. at 975). She described her biggest fear as falling without being able to contact anyone or anyone knowing that she had fallen. (*Id.*). Dr. Masilamani observed Claimant having difficulty ambulating and using her right arm. (Tr. at 976). However, later that month, on September 19, 2012, when Claimant presented to SMMC's Emergency Department ("ED") with tachycardia, she had no motor or sensory deficits. (Tr. at 805, 809). Similarly, the following month, on October 22, 2012, Claimant reported no weakness, dizziness, lightheadedness, fainting, memory issues, tremors, numbness, or difficulty with balance. (Tr. at 788).

On December 17, 2012, Claimant was again seen for mental health management

and exhibited difficulty with her gait. (Tr. at 981). However, less than a week later, on December 21, 2012, during Claimant's treatment for coronary artery disease, it was noted that Claimant exercised regularly and her examination showed no neurological problems and normal pedal pulses. (Tr. at 983-84).

On January 19, 2013, Claimant presented to SMMC's ED with mild numbness and tingling in her fingers and toes on her left side. (Tr. at 1004, 1011). She stated that she had similar symptoms when she had a stroke in March and was concerned that she was having another one. (Tr. at 1004, 1009). She did not have any weakness, impaired speech, difficulty walking, or recent falls. (Tr. at 1011). A CT scan and MRI showed no acute findings or new infarct. (Tr. at 1004, 1052). Claimant's neurological findings showed normal speech, strength of 5/5 in her upper and lower extremities, and no pronator drift. (*Id.*). She reported decreased sensation in the left extremities, but focal weakness was not observed; at times, she exhibited poor effort in the left handgrip. (Tr. at 1009). Claimant's left-sided paresthesias were described as somewhat atypical for a stroke. (*Id.*). She had no motor deficit and normal reflexes. (Tr. at 1012).

On February 13, 2013, Claimant presented to SMMC's ED complaining of anxiety and auditory hallucinations. (Tr. at 1089). Her neurological examination revealed no weakness, cerebellar findings, motor or sensory deficits. (Tr. at 1089-90). The clinical impression was that Claimant had suffered an anxiety reaction. (Tr. at 1092). She was discharged to follow-up with her psychiatrist at the next scheduled appointment. (*Id.*).

On June 11, 2013, Claimant presented to the ED with complaints of confusion and disorientation. (Tr. at 1136). She did not have any dizziness, speech problems, or motor or sensory deficits. (Tr. at 1136-37). An EKG, chest x-ray, and CT scan of her head revealed no acute changes. (Tr. at 1137). She looked well and was neurologically intact. (Tr. at

1139). Dr. Ahmad, felt that Claimant could be discharged for outpatient follow-up. She was in stable condition at the time of discharge. (*Id.*).

On August 6, 2013, Claimant presented to the ED after falling in the Kroger parking lot. (Tr. at 1101). She complained of moderate pain, but a review of her systems was negative, with no evidence of numbness, dizziness, or weakness. (*Id.*). She did not have any motor or sensory deficits, and her reflexes were normal. (Tr. at 1102). Claimant was diagnosed with a minor closed head injury, abrasion to the right knee, cervical strain, and multiple contusions to the head, face, right shoulder, and right knee. (Tr. at 1105). She was discharged from the ED in good condition with instructions to return if needed. (*Id.*).

On August 15, 2013, during a primary care follow-up with Sara Clagg, Certified Family Nurse Practitioner ("C-FNP"), Claimant reported that she fell the prior week and had an episode of confusion that lasted about twenty-four hours. (Tr. at 1181). She saw Dr. Ahmad, who ordered a CT scan of her head and an EMG, both of which were negative. (*Id.*). Dr. Ahmad thought Claimant probably had a transient ischemic attack ("TIA"). (*Id.*). She reported intermittent neck and right arm pain and intermittent TIA symptoms. (Tr. at 1183). However, on examination, her cranial nerves, gait, and stance were normal, although she exhibited some weakness in the lower extremities, worse on the right. (*Id.*).

On December 10, 2013, during a visit with Nurse Clagg, Claimant reported increased back pain due to a change in her mattress, but she had no other musculoskeletal complaints. (Tr. at 1173). Her gait and stance were normal. (*Id.*). The following month, on January 14, 2014, Claimant stated that she was feeling fine since her last visit. (Tr. at 1165). Her gait and stance were still normal, and she reported no musculoskeletal symptoms. (Tr. at 1167).

On March 4, 2014, Claimant presented to Dr. Ahmad, complaining of knots in her

hands and arms. (Tr. at 1221). Her EMG revealed no evidence of carpel tunnel syndrome. (*Id.*). She exhibited good strength on examination, but was hyperrelexic throughout. (*Id.*). Her plantar responses seemed extensor and vibration was mildly decreased. (*Id.*). In view of the negative EMG results, Dr. Ahmad felt that cervical spondylolisthesis should be considered as a possible cause of Claimant's symptoms. (*Id.*). However, a cervical spine MRI taken in May 2014 showed only multilevel degenerative changes, mostly mild, with the most prominent findings at the C5-C6 level. (Tr. at 1220).

On May 13, 2014, during Claimant's primary care follow-up appointment, Nurse Clagg documented Claimant's report of weakness and her statements that she was limited to sitting one to two hours and standing or walking approximately one hour. (Tr. at 1154). Claimant further reported that she had a disability hearing soon and had brought a functional capacity form with her to the appointment. Nurse Clagg observed that Claimant's gait and stance appeared abnormal, and she had musculoskeletal weakness. (Tr. at 1156-58). However, during Claimant's appointment the following month, she reported no musculoskeletal or cardiovascular symptoms and had normal musculoskeletal strength, gait, and stance. (Tr. at 1161).

On May 16, 2014, Claimant presented to the ED with chest pain. (Tr. at 1186). Her cranial nerves were intact, but her deep tendon reflexes were mildly hyperactive on the right side. (Tr. at 1188). Testing of her cerebellar function showed some abnormality; specifically, evidence of past-pointing on the right side. (*Id.*). Her strength was 5/5 in her upper and lower extremities bilaterally. (*Id.*). She had no motor or sensory deficits. (Tr. at 1193).

On June 2, 2014, Claimant was seen by Dr. Ahmad in follow-up. (Tr. at 1219). Dr. Ahmad reviewed the cervical spine MRI, noting degenerative changes, but no evidence of

spinal cord compression. (*Id.*). He did find that Claimant had a Vitamin B12 deficiency and ordered her to take 100 mg. of Vitamin B12 daily. Shortly thereafter, on June 13, 2014, Claimant presented to the hospital after falling at home. (Tr. at 1233). She had no neurological complaints, but reported pain in her left extremities. (Tr. at 1234). Medical imaging was performed, which showed no acute intracranial process. (Tr. at 1235). On examination, Claimant had a full range of motion in her left extremities and no focal deficits. (Tr. at 1238). She was diagnosed with contusions of her extremities and headache, and was discharged home. (Tr. at 1235).

### B. Evaluations and Opinions

On July 27, 2012, Claimant was evaluated by Drew C. Apgar, J.D., D.O., F.C.L.M., for the West Virginia Disability Determination Service ("WV DDS"). (Tr. at 550-66). She was able to independently get on and off the examination table, move about the room, dress, and undress, albeit with difficulty. (Tr. at 554). She had no issues with speech or gait. (Tr. at 555, 559). Her neurological examination was normal. (Tr. at 561). Claimant's muscle strength was slightly diminished in her right arm, which was her dominant arm, but was normal in all other extremities. (*Id.*). Her grasp, fine coordination, pinch, and manipulation were also diminished in her right hand. (Tr. at 559-60). She could not perform rapid alternating hand movements without difficulty. (Tr. at 561). She did not have any significant compromise in her range of motion with the exception of her lumbar spine and she did not have any issues with her joints. (*Id.*). Claimant's gait was unsteady, deliberate, and antalgic, but it was weight-bearing and she did not require any devices for ambulation. (*Id.*).

Ultimately, Dr. Apgar opined that, based on objective findings, Claimant would have some difficulty with sitting and marked difficulty with standing, walking, traveling,

carrying, pushing, pulling, and handling objects with her dominant hand. (Tr. at 562). He did not quantify the level of functional deficits suffered by Claimant. He considered Claimant's efforts to be satisfactory and viewed the test results as reliable. (*Id.*).

On September 10, 2012, Lisa C. Tate, M.A., conducted a psychological examination of Claimant for the WV DDS. (Tr. at 683). Claimant had a normal gait and posture on the day of the examination, good usage of her limbs, and no speech issues. (Tr. at 683-84). She described her daily activities as working three days a week as a clinical coordinator of the dental department at Ebenezer Clinic and going to the convenience store every other day. (Tr. at 685, 687).

On November 6, 2012, Kip Beard, M.D., examined Claimant for the WV DDS. (Tr. at 812). Claimant reported that she had two known strokes, instead of three, as was noted in her allegation list. (*Id.*). Both strokes occurred earlier that year in March and August, 2012. (*Id.*). She reported that she had improved since her strokes, but that her right leg would occasionally still give out. (*Id.*). She also reported that her hands swelled at night and she had trouble with fine motor control, which created some difficulty with manipulating dental instruments in her job and with tasks that required her to use both hands. (Tr. at 812-13). On the day of the examination, Claimant exhibited a slight limp and a slight decrease of spontaneous arm swing on the right. (Tr. at 814). Nevertheless, her gait was not unsteady, and she did not present with or require ambulatory aids. (Tr. at 814). Claimant could stand unassisted and arise from her seat and step up and down from the examination table. (*Id.*). She appeared comfortable while seated and supine. (*Id.*). Claimant's speech was slightly dysarthric, but she showed no aphasia and her speech was easily understandable. (*Id.*). Claimant did not have any limitation in range of motion and could make a fist, extend her fingers, and oppose the thumbs. (Tr. at 815). In her right

hand, Claimant had slight degree of uncoordination on picking up a small object and decreased grip strength of 4/5. (*Id.*). She also had very slight weakness in her right wrist and ankle. (*Id.*). Claimant's reflexes were symmetric and she did not have any pathological reflexes. (Tr. at 816). She possibly had slight right facial droop, but her cranial nerves were intact. (*Id.*).

On November 19, 2012, consulting examiner, Dominic Gaziano, M.D., completed a physical RFC opinion of Claimant at the initial level of her DIB claim. (Tr. at 82-85). Dr. Gaziano concluded that Claimant could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, and stand or walk for 6 hours in an 8-hour workday. (Tr. at 82). Claimant was limited in pushing and pulling with her right upper extremity, which would include the operation of hand controls, and showed clinical evidence of mild manipulatory impairment on the right. (*Id.*). As far as postural limitations, Claimant could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but she could never climb ladders/ropes/scaffolds. (Tr. at 82-83). She was unlimited in reaching in any direction and handling (gross manipulation), but was limited in fingering (fine manipulation) on the right. (Tr. at 83).

On November 22, 2012, consulting psychologist, Debra Lilly, Ph.D., completed a Psychiatric Review Technique. (Tr. at 94). Dr. Lilly opined that Claimant had non-severe affective and anxiety-related disorders. (*Id.*). She had mild restriction in activities daily of living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. at 94-95). She had no episodes of decompensation of extended duration. (Tr. at 95). Dr. Lilly found Claimant to be partially credible because she engaged in a variety of activities and her reported symptom severity was inconsistent. (Tr. at 96).

On January 28, 2013, Dr. Ahmad provided a medical source statement in the form

of a letter simply stating that in his opinion, Claimant was disabled from gainful employment. (Tr. at 1079). Thereafter, on May 13, 2014, Claimant's treating nurse practitioner, Sarah Clagg, C-FNP, completed a physical RFC form regarding Claimant. (Tr. at 1152). Ms. Clagg stated that Claimant could only sit for two hours in a work day, but she did not note any manipulative limitations. (*Id.*).

On March 12, 2013, Claimant was evaluated by agency consultants at the reconsideration level of her DIB claim. Rogelio Lim, M.D., completed a physical RFC form which comported with Dr. Gaziano's RFC assessment. (Tr. at 115-17). Dr. Lim noted Claimant's newer clinical evidence in which she complained of reduced sensation in her left extremities, but showed no motor weakness, speech impairment, or difficulty walking. (Tr. at 117). Dr. Lim did not find Claimant's allegations to be fully credible. (*Id.*). Consulting psychologist Jeff Boggess, Ph.D., performed a psychiatric review technique and made the same findings as Dr. Lilly. (Tr. at 113). He noted that the evidence reflected no severe mental impairments. (*Id.*). Claimant worked 3 days per week at a job that was already part-time before the alleged onset of disability and engaged in other activities of daily living. (*Id.*). Dr. Boggess also found Claimant to be only partially credible. (Tr. at 114).

On May 27, 2014, Dr. Ahmad completed a physical RFC form concerning Claimant. (Tr. at 1217). Dr. Ahmad stated that Claimant was disabled since March, 2012 and noted that Claimant could carry no more than 10 pounds, stand or walk less than two hours, sit for two hours, and was limited in pushing or pulling with any of her extremities. ((*Id.*). Dr. Ahmad also opined that Claimant could only occasionally balance or stoop and could never perform any other postural activities, including climbing ramps or stairs. (*Id.*). He further provided that Claimant was limited in all manipulative categories of reaching,

handling, fingering, and feeling. (*Id.*). Finally, he found that Claimant should avoid all exposure to hazards and have limited exposure to other environmental factors. (*Id.*).

## VI.   **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   **Discussion**

As previously stated, Claimant challenges the weight that the ALJ gave to the opinions of the non-examining state agency consultants, the ALJ's credibility assessment, and the ALJ's alleged failure to consider the decisions of other state agencies.

### A. *Weight of the Opinion Evidence*

In her first challenge, Claimant contends that the ALJ gave controlling weight to the opinions of non-examining agency consultants even though the opinions were contradicted by all of the other evidence in the record; therefore, Claimant argues that the RFC is not supported by substantial evidence. (ECF No. 10 at 5). To bolster her contention, Claimant points to the following specific errors: (1) the ALJ did not address findings in the non-examining consultants' RFC assessments that Claimant was limited in her right upper extremity when it came to operating hand controls; (2) the ALJ erred by accepting a consultant's opinion that Claimant could still perform her prior job as a telemarketer—as she actually performed it—even though the evidence refuted such a conclusion; (3) the ALJ erred by giving significant weight to consultants' opinions that were rendered prior to completion of the record and without the additional medical evidence generated between March 2013 and June 2014; (4) and the ALJ inappropriately disregarded the opinions of Dr. Apgar, Dr. Ahmad, and Nurse Clagg. (*Id.* at 5-8). According to Claimant, the evidence as a whole verifies her history of repeated falls, gait and strength issues related to her right leg, and problems with "lift" since her infarct, which would support greater limitations in the RFC than those included by the ALJ. Claimant argues that the ALJ erred by finding Claimant capable of standing and walking for 6 hours in an 8-hour day and of frequently picking up objects with her right hand. (*Id.* at 8).

Regarding Claimant's first alleged error, the undersigned disagrees with Claimant's factual premise that the ALJ "[did] not address the finding in both nonexamining physical RFC's [sic] that the claimant is limited in the right upper extremity when it comes to operating hand controls." (ECF No. 10 at 6). In her RFC

discussion, the ALJ expressly acknowledged that Claimant "continues to experience some mild residual right sided weakness" and "[b]oth consultative examiners noted [...] right-sided weakness in grip and muscle strength." (Tr. at 23). Within the same paragraph, the ALJ clearly explained that Claimant's muscle strength had improved since those examinations, stating: "As recent as March 2014, [Claimant] was noted to have good strength [...]" (*Id.*). Citing the recent clinical evidence that informed her decision, the ALJ added that she "accounted for the claimant's weakness in the [RFC] with exertional, postural, manipulative, and environmental limitations." (*Id.*). In particular, the ALJ limited Claimant to lifting, carrying, *pushing or pulling* 20 pounds occasionally and 10 pounds frequently, as well as restricting Claimant to only frequent handling and fingering with her right upper extremity. (Tr. at 18). Thus, contrary to Claimant's assertion, the ALJ did, in fact, address the agency consultants' findings that Claimant's strength was limited in her upper extremity. The ALJ explained that she considered those opinions, but found recent clinical evidence to more accurately reflect Claimant's ability to use her right upper extremity.

Having reviewed the record, the undersigned finds that the ALJ's analysis of the medical evidence on this point is supported by substantial evidence. Claimant's treatment records from June 2013 through June 2014 are unremarkable regarding any issues with Claimant's right upper extremity. Indeed, the records reveal many instances on which Claimant had no motor or sensory deficits, (Tr. at 1136-37, 1102, 1193), no weakness, (Tr. at 1101), musculoskeletal complaints limited to her right leg and back, (Tr. at 1183, 1173), no musculoskeletal symptoms at all, (Tr. at 1167), or only complaints regarding her left extremities. (Tr. at 1234). As noted by the ALJ, Dr. Ahmad stated in March 2014 that Claimant had good strength on examination, although she was hypperreflexic

throughout. (Tr. at 1221). Claimant's subsequent records in May 2014 demonstrate normal musculoskeletal strength, (Tr. at 1161), and strength of 5/5 in all of her extremities. (Tr. at 1188). Therefore, the ALJ's RFC assessment regarding Claimant's right upper extremity is both properly articulated in her decision and supported by the objective evidence in the record.

Claimant's next contention is that the ALJ erred in giving the agency consultants' opinions significant weight when one of those consultants incorrectly found that Claimant was capable of performing the tasks of her past relevant work as a telemarketer in the same manner as she actually performed them. The genesis of this argument is Claimant's description of her job duties as a telemarketer, which she alleged required her to sit for seven or more hours in an eight-hour workday. Claimant argues that performing telemarketing duties as she actually performed them would not be possible in light of her RFC finding, which limited her to a maximum of six hours of sitting. (ECF No. 10 at 6). The undersigned does not find this argument persuasive.

First, giving a medical source opinion significant weight does not mean that the ALJ must adopt every aspect of the opinion. To the contrary, the ALJ may give great weight to an expert's opinion without incorporating every finding, limitation, and assessment contained in the expert's record. *See, e.g., Laing v. Colvin,* No. SKG–12–2891, 2014 WL 671462, at *10 (D. Md. Feb. 20, 2014) ("Although the ALJ accorded 'great weight' to the state agency psychologists, he was not required to adopt every single opinion set forth in their reports.") (citing *Bruette v. Comm'r Soc. Sec.,* No. SAG–12–1972, 2013 WL 2181192, at *4 (D. Md. May 17, 2013)). Second, the vocational expert testified that, taking into account Claimant's RFC and other vocational factors, she could work as a telemarketer, photocopier operator, parking lot attendant, production

19

inspector, and dental receptionist. The vocational expert confirmed that this testimony was consistent with the definitions of those occupations in the Dictionary of Occupational Titles. (Tr. at 65-67). Therefore, it is inapposite whether Claimant could perform her prior job duties as they were performed. It is enough that she is capable of performing the telemarketer's duties as they generally exist in the national economy. *See* SSR 82-61, 1982 WL 31387 (S.S.A. 1982) ("Under sections 404.1520(e) and 416.920(e) of the regulations, a claimant will be found to be 'not disabled' when it is determined that he or she retains the RFC to perform: 1. The actual functional demands and job duties of a particular past relevant job; *or* 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.")

Turning to the final challenge, Claimant asserts that the ALJ improperly relied solely on the opinions of non-examining agency experts, who did not review all of the evidence, and improperly discounted the opinion of an examining consultative physician and Claimant's treating medical providers. (ECF No. 10 at 7-9). When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2).

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. *Id.* § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining

medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* § 404.1527(c)(1)-(2). A treating physician's opinion on the nature and severity of an impairment may be afforded controlling weight when the following two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996). "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive

contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. *Id.* § 404.1527(c)(4). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the Regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about

whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In this case, the ALJ stated that she considered all of the medical source opinions relating to Claimant's ability to perform basic work activities, and she explicitly assigned weight to each opinion. (Tr. at 22). In evaluating Claimant's RFC, the ALJ assigned no weight to the opinion of Claimant's treating neurologist, Dr. Ahmad, that Claimant was disabled from gainful employment. The ALJ explained that whether or not a claimant is disabled is not a medical opinion; rather, it is an administrative finding reserved to the Commissioner. Moreover, Dr. Ahmad did not support his opinion with reference to any objective medical evidence or explanation. (Tr. at 22).

The ALJ also gave little weight to Dr. Ahmad's subsequent RFC assessment that Claimant was not capable of performing even sedentary work, not capable of any postural activities other than occasional balancing and stooping, had limited manipulation, and could only have limited environmental exposure. (*Id.*). Likewise, the ALJ gave little weight to a similar RFC opinion provided by Claimant's treating nurse practitioner, Ms. Clagg, that Claimant was not capable of even sedentary work and could never balance or stoop. (*Id.*). The ALJ noted that these opinions were not accompanied by a reasonable explanation or by references to clinical evidence. In addition, the ALJ explained that in Nurse Clagg's case, although her opinions were to be considered, she was not an "acceptable medical source" under the social security regulations. (*Id.*). Thus, her opinions were not entitled to controlling weight. The ALJ also gave little weight to the

opinion of Dr. Apgar who examined Claimant at the behest of the WV DDS in July 2012. (Tr. at 20). The ALJ found that Dr. Apgar entirely failed to quantify the degree of limitation he found; accordingly, his opinion was of limited use in crafting an RFC finding. (*Id.*). In contrast, the ALJ gave "significant" weight to the opinions of the non-examining agency consultants, who found that Claimant was capable of light level work with occasional postural activities other than no climbing ladders, ropes, or scaffolds, and manipulative and exertional limitations. (Tr. at 22). The ALJ explained that these opinions deserved greater weight because they were internally consistent, well-supported by reasonable explanation, and corroborated by the available evidence. (Tr. at 22-23).

In her RFC discussion, the ALJ provided a thorough analysis of the evidence which supported her RFC determination and the weight that she assigned to the various medical opinions. (Tr. at 20-22). As part of her discussion, the ALJ reconciled various conflicts in the record and demonstrated how the evidence, especially when considered longitudinally, supported an RFC finding that Claimant was capable of light work with some additional exertional, postural, manipulative, and environmental limitations. The ALJ concluded that despite Claimant's history of strokes and her mild residual right-sided weakness, she was frequently found to have unremarkable physical findings. She was also regularly described as having a normal gait and stance, except when she was being seen or examined for disability purposes. (Tr. at 23).

Further, the ALJ noted that although Claimant suffered an additional stroke in January 2013, there was no evidence of residual left-sided weakness, and as recently as March 2014, Claimant was noted to have good strength in her extremities. (*Id.*). The ALJ pointed out that Claimant had minimal medical care after her stroke, and the care she did receive consisted of routine, regularly-scheduled appointments. Claimant did not require

changes to her medications or to her treatment plan. (*Id.*). The ALJ also noted that during the alleged period of disability, Claimant's activities included working three full-time days per week, using public transportation, caring for two to three children, shopping, playing poker, collecting unemployment benefits, and applying for jobs. (*Id.*).

The undersigned finds that the ALJ's assessment of the opinion evidence is adequately explained in her decision and is supported by substantial evidence. As noted, Claimant's treating medical providers' opinions that she was disabled and could not perform even sedentary work were not entitled to controlling weight, as the RFC finding and ultimate determination of disability are issues reserved to the Commissioner. Further, as noted by the ALJ, the remaining opinions by these providers were assigned little or no weight, because they were not accompanied by a reasonable explanation or any supporting medical evidence.

In January 2013, the same month that Dr. Ahmad wrote a medical source statement that Claimant was not capable of gainful employment, Claimant's records document an ED visit in which Claimant complained of mild numbness and tingling in her left extremities. However, when examined, Claimant had no weakness, impaired speech, difficulty walking, or recent falls. (Tr. at 1009). She had strength of 5/5 in all extremities, no pronator drift, no focal weakness, no motor deficits, and normal reflexes. (Tr. at 1006, 1052, 1009, 1012). Similarly, in the month after Dr. Ahmad's letter, Claimant presented to the ED for an anxiety reaction, but again had no evidence of weakness, abnormal cerebellar functioning, or motor or sensory deficits. (Tr. at 1089-90).

Likewise, although Nurse Clagg's records in May 2014, the month that Ms. Clagg provided a medical source statement, document that Claimant had an abnormal gait and stance and musculoskeletal weakness, (Tr. at 1156-58), Nurse Clagg's records from the

following month noted normal musculoskeletal strength, gait, and stance, (Tr. at 1161).
Notably, as the ALJ emphasized, Claimant's symptoms were present when she discussed
disability paperwork with Nurse Clagg, but were not present when the disability
proceeding was not an immediate concern. Moreover, Nurse Clagg did not offer any
medical or evidentiary support for her opinion that Claimant was not capable of even
sedentary work.

Dr. Ahmad also provided his RFC form in May 2014, stating that Claimant was not
capable of even sedentary work, but that form consisted of merely a checklist. Dr. Ahmad
checked various boxes without supplying any explanation for his findings; therefore, the
ALJ properly assigned little weight to this opinion. *See Hampton v. Colvin*, No. 1:14-cv-
24505, 2015 WL 5304294, at *23 (S.D. W.Va. Aug. 17, 2015) (collecting cases where courts
found that ALJs properly assigned little weight to treaters' opinions contained in checklist
forms when treaters failed to provide explanation as to opinions contained therein),
*report and recommendation adopted by* 2015 WL 5304292 (S.D. W.Va. Sept. 9, 2015);
*Copley*, 2015 WL 4621641, at *28 (finding treating physician's use of check-box form
without explaining opinions contained therein was one of several good reasons for ALJ to
discount treater's opinion). Aside from lacking any degree of explanation, Dr. Ahmad's
RFC opinion was not supported by Claimant's medical records. In the same month that
Dr. Ahmad provided the RFC assessment, Claimant presented to the ED for chest pain
and was noted to have full strength in all of her extremities and no motor or sensory
deficits. (Tr. at 1188, 1193). Based on this evidence and the other evidence discussed, the
ALJ's decision to accord little weight to Claimant's treating medical providers is
supported by substantial evidence.

As far as the weight given to the opinions offered by Dr. Apgar, the undersigned finds that it is also supported by substantial evidence. The ALJ acknowledged Dr. Apgar's opinion that Claimant would have marked difficulty with standing, walking, traveling, lifting, carrying, pushing, pulling, and handling objects with the dominant hand. (Tr. at 20). However, the ALJ assigned little weight to the opinion because it lacked any specification or clarification as to what degree of limitation Dr. Apgar intended to convey with the term "marked." (*Id.*). As previously noted, the ALJ incorporated restrictions in Claimant's RFC relating to standing, walking, lifting, carrying, pushing, pulling, and handling and fingering objects with her right upper extremity. (Tr. at 18). Therefore, the ALJ's RFC finding is not inconsistent with Dr. Apgar's findings.

The final issue regarding the ALJ's RFC determination is the fact that she gave significant weight to the opinions of the non-examining agency consultants. Claimant argues that the opinions of the non-examining sources do not rely on all of the evidence and are not supported by any of the other opinions in the record. (ECF No. 10 at 7). The ALJ stated that she gave significant weight to the non-examining consultant's opinions in her RFC assessment because their opinions were based on a thorough review of the available medical records and a comprehensive understanding of agency rules and regulations. (Tr. at 22). Also, the ALJ found the opinions to be internally consistent and well-supported by reasonable explanation and the available evidence. (Tr. at 22-23).

Regarding Claimant's first assertion, the undersigned acknowledges that an ALJ may err by relying chiefly on an opinion given prior to significant changes in a claimant's condition or treatment. *See Fraley v. Astrue,* 2:10–CV–00762, 2011 WL 2681647, at *7 (S.D.W.Va. July 11, 2011) (finding that ALJ erred in relying on state agency medical source opinion formed before "key medical evidence" related to claimant's impairments was

available); *see, also, Starcher v. Colvin,* No. 1:12–01444, 2013 WL 5504494, at \*7 (S.D.W.Va. Oct. 2, 2013). In *Starcher,* the court further explained that "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it. *Only where 'additional medical evidence is received that in the opinion of the [ALJ] ... may change the State agency medical ... consultant's finding' ... is an update to the report required." Id.* (quoting *Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356, 361 (3d Cir.2011)) (emphasis added) (ellipses and brackets in original). Consequently, when reviewing a final decision that is based primarily upon an early-issued medical source statement, the court must examine the record to determine if after-acquired medical evidence might reasonably alter the medical source's findings, and thus require an updated evaluation.

In the instant case, the undersigned finds no evidence in the record after November 2012 that demonstrates either a significant change, or a noticeable deterioration, in Claimant's condition, which would render the agency consultants' opinions invalid. In fact, the record indicates that Claimant's condition improved from the time that the agency physicians, Drs. Gaziano and Lim, provided their opinions. Therefore, the additional medical evidence would not reasonably have resulted in a more restricted RFC and actually may have resulted in less limitations. Following March 2013, Claimant's neurological examinations were consistently normal, and she generally did not have any musculoskeletal complaints, muscle weakness, or focal deficits. (Tr. at 983-84, 1012, 1089-90, 1136-37, 1139, 1101, 1102, 1173, 1167, 1221, 1161, 1188, 1193, 1234, 1238). Although her treating nurse practitioner did note during one visit that Claimant had

weakness in her right leg and an abnormal gait and stance, and Nurse Clagg also noted during another visit that Claimant had musculoskeletal weakness, the records are otherwise unremarkable and show that even those particular complaints resolved. (Tr. at 1161, 1188, 1193, 1234, 1238). Consequently, key medical evidence was not supplied after the consultants provided their opinions.

Further, the undersigned disagrees with Claimant's contention that the non-examining opinions are not supported by any other opinion evidence. Consultative examiner, Dr. Beard, confirmed in his report that Claimant's condition had improved after her strokes; he noted that Claimant only slightly limped on her right side, her gait was not unsteady, and she did not present with or require ambulatory aids. (Tr. at 813-14). She could stand unassisted, arise from her seat, step up and down from the examination table, and appeared comfortable while seated and supine. (Tr. at 814). She had only a slight degree of incoordination on picking up a small object and grip strength of 4/5 in her right hand. (Tr. at 815).

Thus, the ALJ's decision to afford significant weight to the opinions of the non-examining consultants is appropriate and supported by substantial evidence. The ALJ adequately identified the conflicting evidence, resolved the conflicts, and articulated why certain evidence was entitled to greater or lesser weight. Further, contrary to Claimant's assertion, the record does not support greater limitations than those provided in the ALJ's RFC assessment. As previously discussed, Claimant's records show that she suffered from, at most, minimal right-sided weakness and minimal difficulty with fine coordination with her right hand. The non-examining agency consultants' opinions and the ALJ's RFC assessment account for such limitations. Therefore, the undersigned **FINDS** that the ALJ's RFC determination is supported by substantial evidence.

### B. Credibility

Claimant next challenges the ALJ's credibility assessment. Pursuant to 20 C.F.R. §§ 404.1529, 416.929, the ALJ evaluates a claimant's report of symptoms using a two-step method. First, the ALJ must assess whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and

30

laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

SSR 16-3p provides further guidance on how to evaluate a claimant's statements regarding the intensity, persistence, and limiting effects of his or her symptoms. For example, the Ruling stresses that the consistency of a claimant's own statements should be considered in determining whether a claimant's reported symptoms affect his or her ability to perform work-related activities. *Id.* at *8. Likewise, the longitudinal medical

record is a valuable indicator of the extent to which a claimant's reported symptoms will reduce his or her capacity to perform work-related activities. *Id.* A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms may support a claimant's report of symptoms. *Id.* On the other hand, an ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record," where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," or "the individual fails to follow prescribed treatment that might improve symptoms." *Id.*

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person"; rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for

those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of her symptoms were only partially credible. (Tr. at 23). The ALJ noted that Claimant complained of limited mobility, inability to move the right side of her body, and right-sided weakness; she further reported that she could stand no more than 20 to 30 minutes; dragged her right foot, which impacted her ability to walk; and fell multiple times. (Tr. at 19). However, the ALJ stated that despite Claimant's mild residual right-sided weakness, she was generally observed to have a normal gait and stance; she had good strength as recently as March 2014; and there was no evidence of residual left-sided weakness. (Tr. at 23). The undersigned finds that this conclusion is supported by substantial evidence. (Tr. at 983-84, 1012, 1089-90, 1136-37, 1139, 1101, 1102, 1173, 1167, 1221, 1161, 1188, 1193, 1234, 1238).

In assessing Claimant's credibility, the ALJ also considered Claimant's conservative treatment, noting that Claimant had minimal medical care after her initial stroke, and the care that she did receive consisted largely of regularly-scheduled follow-

up appointments. (Tr. at 23). Further, the ALJ noted that Claimant tolerated her medications well, without side effects, and few modifications were made to her treatment regimen. (Tr. at 21, 23). In June 2014, when Claimant presented to the hospital complaining of another fall, her cardiac and neurological work-ups were normal. (Tr. at 22). The treating physicians found that Claimant had some degenerative changes of the spine, but the only treatment she needed was to begin taking Vitamin B12 tablets. Claimant argues in response that "it's not clear that there is much medical follow up beyond regular appointments that can be done for the residuals of multiple strokes" and further states "there is nothing that suggests that adding more medication would help her" because "[s]ometimes it is just a matter of finding what medication will keep her stable and then maintaining it." (ECF No. 10 at 10). Claimant misses the point of the ALJ's discussion, which is that Claimant's care plan did not require much tweaking to stabilize her condition and she did not need more aggressive treatment, both of which indicate that her condition following her strokes was, in fact, stable and less debilitating than alleged by Claimant.

In addition to the objective medical evidence, the ALJ looked to Claimant's activities of daily living to determine whether her statements regarding the intensity, persistence, and limiting effects of her symptoms were credible. (Tr. at 23). The ALJ determined that the evidence was inconsistent with the level of limitations asserted by Claimant. (*Id*.). The ALJ noted that Claimant continued to work part-time after the alleged onset of disability, used public transportation, cared for two to three children, shopped, played poker, collected unemployment benefits, and submitted work applications. (*Id*.). These activities were not compatible with Claimant's alleged functional limitations. Furthermore, Claimant continued to smoke despite repeated

instructions from her medical providers that she needed to stop smoking. (Tr. at 21).

Claimant contends that the ALJ mischaracterized the above activities and they should not be used to undermine her credibility. She states that although she worked during the disability period, the residual limitations from her strokes substantially affected her ability to perform her work activities, ultimately resulting in the termination of her employment as a dental assistant. (ECF No. 10 at 10). In addition, Claimant asserts that although she used public transportation, she had trouble stepping on and off the bus and would forget to pull the request cord in time. (*Id.*). With regard to childcare, Claimant appears to suggest that only her eldest child, who was 28 at the time, was living with her and that child helped her with housework and cooking. (*Id.* at 10-11). In terms of hobbies, Claimant states that her later function reports show that she stopped playing cards due to her limitations and began shopping for food only twice per month. Moreover, shopping was difficult for her, because she would bump into people and things in the store with the right side of her body. (*Id.* at 11). Finally, Claimant contends that she should not be penalized for receiving unemployment benefits and continuing to look for jobs, as she wanted to work despite her impairments. (*Id.*).

As an initial matter, the undersigned finds Claimant's statement regarding childcare to be inconsistent with the evidence. Claimant reported on more than one occasion that she lived with and cared for her youngest daughter, who was a preteen during most of the alleged period of disability. (Tr. at 346-47, 570, 970, 1187). Therefore, her statement that only her oldest daughter lived with her and the associated suggestion that she did not provide childcare for any younger child does not appear to be credible. Furthermore, Claimant's other allegations regarding limitations in her activities of daily living are unsupported by other evidence. The ALJ was charged with reconciling

discrepancies in the evidence and comparing Claimant's subjective complaints against other evidence in the record, including objective medical evidence. The ALJ completed those tasks. Finally, Claimant's activities of daily living were just one of several factors considered by the ALJ in assessing Claimant's credibility. The ALJ also considered the medical evidence, statements in the medical records and function reports, and the side effects of Claimant's medications. The record substantiated the ALJ's finding that Claimant's allegations regarding the severity, persistence, and debilitating nature of her symptoms were not fully credible. Therefore, the undersigned **FINDS** that the ALJ's credibility assessment is supported by substantial evidence.

### C. SSR 06-03p

Claimant's final challenge to the Commissioner's decision is that the ALJ failed to consider under SSR 06-03p the evidence that Claimant was given a handicap parking placard by the West Virginia Division of Motor Vehicles ("WV DMV") and was awarded Medicaid by the West Virginia Department of Health and Human Resources (WVDHHR). (ECF No. 10 at 11). As correctly stated in the Commissioner's brief, Claimant's reliance on SSR 06-03p is misplaced, because in neither instance did Claimant supply any documentation showing that the responsible state agency made a finding that Claimant was disabled. SSR 06-03p makes clear that a decision by any nongovernmental agency or any other governmental agency finding that Claimant is disabled is not binding on the SSA because it is a decision by that agency based on that agency's standards and rules and not a finding by the SSA based on social security law. SSR 06-03p, 2006 WL 2329939, at *6-7 (S.S.A. Aug. 9, 2006). Nevertheless, "evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered" because it can "provide insight into the individual's mental and physical impairment(s)

and show the degree of disability determined by these agencies based on their rules." *Id.* As such, "the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases." *Id.*

Here, Claimant simply submitted a copy of a disabled persons parking placard. (Tr. at 405). She did not include any other records related to the WV DMV's determination. For example, Claimant failed to provide a copy of her application for the disability placard, which likely included opinion(s) from her medical source(s) as to why she qualified for special parking. Similarly, Claimant failed to produce a determination or a report of findings by the WV DMV, setting forth the basis for the agency's decision that she was entitled to a special placard under its rules. Furthermore, Claimant does not offer any information to substantiate that the WV DMV uses standards and procedures consistent with the SSA when issuing disabled parking placards. From a review of the relevant West Virginia statute, a handicap placard may be issued when a West Virginia citizen has one of a range of various "mobility impairments" as corroborated by a health care provider. *See* W. Va. Code § 17-C-13. Certainly, a determination of disability under the Social Security Act requires considerably more in the way of evidence and analysis prior to granting disability benefits. Thus, the information supplied by Claimant on this issue wholly failed to provide any degree of "insight into [her] mental and physical impairment(s)" and failed to show "the degree of disability determined by these agencies based on their rules." *Id.*

Similarly, Claimant relies on a passing reference in one of her medical records, which states that Claimant's "family has got West Virginia Medicaid approved." (Tr. at 649). Notably, the Medicaid qualification was allegedly granted in March 2012, during

Claimant's hospitalization for her first stroke and before the long-term effects of Claimant's stroke could be assessed. As correctly noted by the Commissioner in response to Claimant's brief, pointing to a notation in the medical records about Claimant's "family" receiving Medicaid is simply not the same as providing evidence of a Medicaid finding of disability.  Since the notation lacks any information as to why Claimant's family qualified for Medicaid, the benefit may have been awarded based on financial need as opposed to disability. (ECF No. 13 at 19). Given that the notation regarding Medicaid does not convey any sort of opinion relating to the severity of Claimant's impairments or her functional limitations, SSR 06-03p does not require the ALJ to explain the consideration given to it.

Therefore, the undersigned **FINDS** that the ALJ did not err by failing to explicitly discuss in the written decision Claimant's disabled person parking placard and receipt of Medicaid.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 10); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the

parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  October 19, 2016

Cheryl A. Eifert
United States Magistrate Judge